IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MEREDITH CIOCIAN, | : |
| | :   CIVIL ACTION |
| Plaintiff, | : |
| | :   FILED ELECTRONICALLY |
| v. | : |
| | :   JURY TRIAL DEMANDED |
| NEW JERSEY STATE POLICE, | : |
| | : |
| Defendant. | : |
| | : |

## COMPLAINT

## I. INTRODUCTION

1.     Plaintiff Meredith Ciocian ("Ms. Ciocian" or "Plaintiff") is a

Florida citizen residing at 619 Dinner Street NE, in  Palm Bay, Florida.

2.     Defendant New Jersey State Police ("NJSP") maintains an

Operational Dispatch Unit ("ODU Central"), at 1400 Negron Drive in

Hamilton, New Jersey.

3.      At all relevant times, the NJSP acted by and through its agents, servants, and employees, each of whom acted within the course and scope of his or her employment for the NJSP.

## II.  JURISDICTION AND VENUE

4.      This is an action for an award of damages, declaratory and injunctive relief, attorneys' fees and other relief on behalf of Ms. Ciocian who has been harmed by Defendant's discrimination against her because of her sex and pregnancy, and in retaliation for her efforts to protect her legal rights.

5.      Ms. Ciocian brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("Title VII").

6.      Ms. Ciocian also brings a pendent state law claim under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 *et seq.*

7.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because Ms. Ciocian's Complaint is based substantively on federal law.

8.     This Court has supplemental jurisdiction over Ms. Ciocian's state law claim pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

10.    All conditions precedent to the institution of this suit have been fulfilled. Specifically, on 18 October 2007 Ms. Ciocian submitted a Charge of Discrimination to the EEOC to initiate an investigation. On September 30, 2008, the U.S. Department of Justice issued a right-to-sue letter at Ms. Ciocian's request. (*See* Exhibit A.)

## III. UNDERLYING FACTS

### A. The New Jersey State Police

11.    Because many municipalities in New Jersey lack local police departments, the state police have the primary responsibility for providing police services to these towns. The New Jersey State Police ("NJSP") is responsible for these general police services, as well as general highway and traffic enforcement, statewide investigation and intelligence services, emergency management, and other law enforcement efforts.

12.    Upon information and belief, the NJSP employs hundreds of persons.

13.    According to the most recent statistics, the NJSP is 97% male. (*See* Law Enforcement Management and Administrative Statistics, 2000: Data for Individual State and Local Agencies with 100 or More Officers, aval. at <http://www.ojp.usdoj.gov/bjs/pub/pdf/lemas00.pdf>.)

14.    The NJSP is a paramilitary organization.

15.    To maintain its paramilitary image, the NJSP requires its troopers to wear uniforms.

16.    Civilian employees who are not in the public eye, such as Ms. Ciocian, are normally required to wear black, SWAT-team style pants. Shirts are a navy blue polo with a state police logo, while shoes are black.

17.    Clothing is issued from a NJSP depot. All the clothing is designed for men, and is in men's sizes.

18.     The NJSP's Troop C is based at the Hamilton Headquarters Communications Building ("Hamilton Station") in Hamilton, New Jersey.

19.     There, the NJSP also maintains a call center, employing more than 40 civilians to handle incoming emergency and non-emergency calls. It is know as Operational Dispatch Central ("ODU Central").

20.     At the relevant times, the hierarchy at ODU Central was:

- Sgt. Griffin, Unit Head
- Sgt. Roger Rochinski, Assistant Unit Head
- Sgt. Dieziec, Floor supervisor
- Ignozio Amari, Supervising Senior Public Safety Telecommunicator.

21.     Four Telecommunicator squads are based at ODU Central.

22.     Two squads work nights, and two work days. Each shift lasts twelve hours.

23.     The NJSP has an unfortunate history of discrimination. For example, in 1999 the NJSP admitted to its practice of racial profiling and

entered into a court-monitored consent decree with the United States Department of Justice.

## B. Ms. Ciocian's Employment with the New Jersey State Police

24.     On or about 19 April 2004 Ms. Ciocian began working for the New Jersey State Police as a Public Safety Telecommunicator ("PST").

25.     As a PST, Ms. Ciocian dispatched state troopers to their stops.

26.     She also answered 911 emergency calls, as well as the non-emergency state police lines.

27.     Ms. Ciocian is an excellent worker, who consistently received excellent performance evaluations.

28.     Until informing the NJSP of her pregnancy, Ms. Ciocian's employment had been uneventful.

## C. Ms. Ciocian's Pregnancy

29.     On April 30, 2007, Ms. Ciocian learned that she was pregnant. Her due date was 9 January 2008.

30.     Ms. Ciocian is unaware of any other pregnant women at ODU Central during her employment there.

31.    Ms. Ciocian spoke openly about her pregnancy, and was congratulated by her coworkers. Her supervisors, however, were silent.

32.    In June 2006, Ms. Ciocian contacted the NJSP's Human Resources department to inform the NJSP of her due date and to determine what else, if anything, she needed to do.

33.    The Human Resources department directed Ms. Ciocian to call Sally Snyder, head of the NJSP's Medical Unit. In turn, Ms. Snyder directed Ms. Ciocian to obtain a letter from her doctor with Ms. Ciocian's due date and an approval that she could continue to work. After getting the required letter from her doctor, Ms. Ciocian gave a copy to Mr. Amari.

**D. The New Jersey State Police's Discrimination Against Ms. Ciocian**

34.    As with all pregnancies, Ms. Ciocian's body changed as her pregnancy progressed. Specifically, Ms. Ciocian's abdomen got larger, as did her bust line.

35.    Accordingly, in early May 2007, Ms. Ciocian told her then-Floor Supervisor, Sgt. Joe Yacono, that she needed a larger shirt to

accommodate the physical changes. Sgt. Yacono told her "not to worry about it" and refused to provide any appropriate clothing.

36.   Despite the NJSP's effort to ignore Ms. Ciocian's pregnancy, her body continued to change as her pregnancy progressed. Because the NJSP failed to accommodate her pregnancy by providing appropriate clothing, in early June 2007 Ms. Ciocian began wearing maternity clothes from Old Navy and Target. She endeavored to find maternity clothing that was similar to the NJSP-issued men's clothing.

37.   Ms. Ciocian wore black maternity pants, gray shoes (to accommodate her swelling feet), and grey and black long sleeve maternity shirts along with a short sleeve gray shirt.

38.   Additionally, at her own cost Ms. Ciocian bought from the NJSP a zip up, black state police sweatshirt. While at work, Ms. Ciocian routinely wore the sweatshirt.

39.   Notably, Ms. Ciocian is a member of Local 195, International Federation of Professional and Technical Engineers ("IFPTE"). The

IFPTE's contract with the NJSP provides that if the NJSP does not provide a maternity uniform, an employee may wear maternity clothes.

40.     In late June 2007, Unit Head Sgt. Griffin confronted Ms. Ciocian about her maternity shirts, alludiing to the increase in the size of Ms. Ciocian's bust and abdomen. Ms. Ciocian explained that she had asked her supervisor for maternity clothing and none was provided.

41.     In mid-July 2007, when Ms. Ciocian was almost four months pregnant, Sgt. Diezec approached her and said that Sgt. Griffin wanted him to address "the shirt issue." Ms. Ciocian explained that she had twice asked for maternity clothing and been denied. Ms. Ciocian stated that she was being harassed because of her pregnancy.

42.     Following her complaint about discrimination, the NJSP retaliated against her when it changed her shift without appropriate notice.

43.     Specifically, during the summer months, the NJSP adds a third shift to cover overtime and marine dispatching. The additional shift,

which runs from 10 a.m. to 10 p.m., is normally assigned on a rotating schedule. All schedule changes require two weeks notice.

44.     The NJSP issues schedules every four weeks. During the week of July 23, 2007, Ms. Ciocian received her schedule to work 6 a.m. to 6 p.m. for the next four weeks. Because Ms. Ciocian is also the mother of a young daughter (who was 3 years old at the relevant time), she must plan childcare around her shift changes.

45.     On July 17, 2006, after her conversation with Sgt. Griffin about "the shirt issue," Ms. Ciocian's shift was changed from the 6 a.m. to 6 p.m. shift to the 10 a.m. to 10 p.m. schedule. This provided Ms. Ciocian with only six days notice—not enough to arrange for child care.

46.     On July 18, 2007, Ms. Ciocian questioned Mr. Amari about the sudden change in her shift. He would not explain the change and stated only that she had to work it.

47.     Ultimately, because of child care issues Ms. Ciocian had to switch shifts with a coworker to cover the shift change.

48. The NJSP continued its discrimination against Ms. Ciocian because of her sex and pregnancy, and in retaliation against her for resisting that discrimination. Specifically, during the last week of August, Ms. Ciocian received her September schedule and discovered that she was assigned two 10 a.m. to 10 p.m. shifts.

49. Ms. Ciocian again went to Mr. Amari about the assignment, and asked why the shift had not been rotated to other employees in her squad. Mr. Amari would not provide an explanation.

50. Because it was clear to Ms. Ciocian that the shift changes were punitive, on September 7, 2007, she sought to speak to Sgt. Griffin. Sgt. Griffin said he was unavailable that day, and would have to get back to her after he spoke to Mr. Amari. He did not.

51. Because Sgt. Griffin refused to meet with her, on September 11, 2007, Ms. Ciocian spoke to Sgt. Rochinski about the schedule changes. Sgt. Rochinski told Ms. Ciocian that she should "stop her bitching" and work her shift. He then stated he had the power to make her work

anytime he wanted, and that if she "keeps bitching," he can "make it worse."

52.    To protect her rights, Ms. Ciocian called the New Jersey State Attorney General's office to lodge a complaint of discrimination.

53.    Ms. Ciocian also contacted the New Jersey Department of Labor Relations.

54.    Upon learning that Ms. Ciocian was taking efforts to protect her legal rights, Sgt. Rochinski again retaliated against her. He demanded that Ms. Ciocian return her NJSP shirts and get bigger ones. Sgt. Rochinski also ordered Ms. Ciocian to wear her sweatshirt zipped up, to cover her pregnancy.

55.    On September 13, 2007, at approximately 9:30 a.m., Sgt. Griffin asked to speak to Ms. Ciocian in his office. Upon entering the office, Sgt. Griffin shut the door and began to interrogate her.  Despite her rights a union member, Sgt. Griffin did not allow anyone to accompany Ms. Ciocian.

56.    Sgt. Griffin told Ms. Ciocian that she had been counseled four times about her shirt (which is not true). Sgt. Griffin told Ms. Ciocian that her shirts were "offensive" and that she drew "undue attention" to herself. Ms. Ciocian felt so embarrassed and humiliated about her pregnancy that she physically shook. Despite having visibly upset Ms. Ciocian, Sgt. Griffin demanded that Ms. Ciocian immediately return her NJSP shirts.

57.    Ms. Ciocian called her fiancé so that he could bring her NJSP shirts to her work.  In the meantime, Ms. Ciocian spoke to union representative Cathy Morgan. Ms. Morgan asked Sgt. Griffin if Ms. Ciocian could try on new shirts to see what would fit.  Sgt. Griffin refused, stating that he would pick the shirts for her.

58.    Sgt. Griffin gave Ms. Ciocian two extra-large shirts to replace her old shirts.

59.    The outfit Sgt. Griffin demanded Ms. Ciocian wear was humiliating. Ms. Ciocian is 5'7" and wears a women's small. Accordingly, the shirts provided by Sgt. Griffin went to Ms. Ciocian's

knees, while the sleeves went to her elbows. Nevertheless, because of her pregnancy, the shirt was tight on her stomach, causing the shirt to pull against her neck when she sat. Ms. Ciocian cried when she saw the shirts. After she tried one on in the women's room, she vomited.

60.     Sgt. Griffin left the building after forcing Ms. Ciocian to change clothes, but not before telling Ms. Morgan that he intended to discipline Ms. Ciocian for insubordination if she failed to wear the shirts he had selected.

61.     The NJSP's discrimination and harassment against Ms. Ciocian caused her to suffer migraines, anxiety, and stress-related pelvic pressure. Because of the danger to her pregnancy, on September 20, 2007, Ms. Ciocian's doctor ordered that she not return to work. Ms. Ciocian was forced to take short-term disability leave.

62.     The NJSP's conduct was outrageous, coercive, and unconscionable.

63.     Ultimately, because of the discrimination and retaliation against her, Ms. Ciocian was constructively discharged from the NJSP.

## COUNT I

### Title VII
(Sex Discrimination; Harassment; Hostile Work Environment; Retaliation)

64.    The foregoing paragraphs are incorporated herein.

65.    Based on the foregoing, Defendant has engaged in unlawful employment practices in violation of Title VII because of Ms. Ciocian's sex, including, but not limited to, perpetuating a hostile work environment, subjecting Ms. Ciocian to discrimination and harassment, subjecting Ms. Ciocian to more onerous working conditions after she complained about the discrimination and harassment, and constructively discharging Ms. Ciocian from her job.

66.    Defendant's actions were intentional, deliberate, willful, malicious, reckless, and conducted with callous disregard of Ms. Ciocian's rights.

67.    As a direct result of Defendant's unlawful discriminatory and retaliatory practices in violation of Title VII, Ms. Ciocian has, among other things, sustained lost earnings, severe emotional and psychological distress, loss of self-esteem, and loss of future earnings

- 15 -

power. Ms. Ciocian has also lost back pay, front pay, and interest due thereon.

## COUNT II

### Title VII
#### (Pregnancy Discrimination; Harassment; Hostile Work Environment; Retaliation)

68.    The foregoing paragraphs are incorporated herein.

69.    Based on the foregoing, Defendant has engaged in unlawful practices in violation of Title VII because of Ms. Ciocian's pregnancy including, but not limited to, perpetuating a hostile work environment, subjecting Ms. Ciocian to unlawful pregnancy discrimination and harassment, subjecting Ms. Ciocian to more onerous working conditions after she complained about the discrimination and harassment, and constructively discharging Ms. Ciocian from her job.

70.    Defendant's actions were intentional, deliberate, willful, malicious, reckless, and conducted with callous disregard of Ms. Ciocian's rights.

71.     As a direct result of Defendant's unlawful discriminatory practices in violation of Title VII, Ms. Ciocian has sustained lost earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earnings power, plus back pay, front pay, and interest due thereon.

## COUNT III

### New Jersey Law Against Discrimination

72.     The foregoing paragraphs are incorporated herein.

73.     By its wrongful and discriminatory actions, Defendant violated the New Jersey Law Against Discrimination.

74.     Persons who provided substantial assistance or encouragement to Defendant's unlawful conduct are individually liable.

## IV. PRAYER FOR RELIEF

75.     The foregoing paragraphs are incorporated herein.

**WHEREFORE**, Ms. Ciocian respectfully requests that the Court enter judgment in her favor and against Defendant and Order:

(a)     that Defendant initiate and implement programs that will (i) provide equal employment opportunities for female employees, pregnant employees, and employees with newborn babies; (ii) remedy the effects of Defendant's past and present unlawful employment policies, practices, and procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described herein;

(b)     that Defendant initiate and implement systems of assigning, training, transferring, compensating, and promoting female employees, pregnant employees, and employees with newborn babies in a non-discriminatory manner;

(c)     that Ms. Ciocian be reinstated to her former position, with all corresponding pay increases, bonuses, training, seniority and any other compensation Ms. Ciocian lost, plus interest;

(d)     that Ms. Ciocian be compensated and reimbursed for all pay and benefits she would have received had it not been for Defendant's illegal actions, including, but not limited to, back pay, front pay, wages, salary, pay increases, bonuses, insurance, benefits, training, promotions,

reinstatement, seniority, and any other compensation Ms. Ciocian lost, plus interest;

(e)    an award of damages for the pain, suffering, inconvenience, mental anguish, humiliation, loss of employment, and other non-pecuniary losses caused by Defendant's actions;

(f)    an award of punitive damages in an amount believed by the trier of fact to punish Defendant for its willful, deliberate, malicious, and outrageous conduct and to deter Defendant and other organizations from engaging in such misconduct in the future;

(g)    an award of the costs and expenses of this action, including Ms. Ciocian's attorneys' fees incurred from representation before the EEOC as required before commencing this action and continuing to the present; and

(h)    that Ms. Ciocian be accorded other equitable and legal relief as the Court deems just, proper, and appropriate.

## V.  JURY DEMAND

Ms. Ciocian demands a trial by jury.

Respectfully submitted,

/s/ Frank Conley

Frank J. Conley, Esquire

*Pending Pro Hac Vice*

THE CONLEY FIRM

7715 Crittenden Street, Suite 113

Philadelphia, PA • 19118

(215) 836-4789

FConley@ConleyFirm.com


/s/ James Veith

James Veith, Esquire

**Veith Law Firm**

3959 Welsh Road, Suite 313

Willow Grove PA • 19090

(215) 674-9891

Jim@VeithLawFirm.com