**NOT FOR PUBLICATION**

```
                  UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
```

|  |  |
|---|---|
| MEREDITH CIOCIAN, :  :  Plaintiff, :  :  v. :  :  NEW JERSEY STATE POLICE, :  :  Defendant. : | CIVIL ACTION NO. 08-6060 (MLC)  **MEMORANDUM OPINION** |

**COOPER, District Judge**

The plaintiff, Meredith Ciocian ("plaintiff"), brought this action alleging claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1 et seq. ("NJLAD"). (Dkt. entry no. 1, Compl. at 2.)  The defendant, New Jersey State Police ("NJSP"), now moves for summary judgment in its favor. (Dkt. entry no. 17, Mot. for Summ. J.)  The plaintiff opposes the motion. (Dkt. entry no. 20, Pl. Br.)  The Court determines the motion on the briefs without an oral hearing, pursuant to Federal Rule of Civil Procedure ("Rule") 78(b).  For the reasons stated herein, the Court will grant the motion.

### BACKGROUND

The plaintiff was employed by the NJSP as a Public Safety Telecommunicator ("PST") responsible for answering 911 emergency calls and non-emergency state police telephone lines, as well as

dispatching state troopers to their stops. (Compl. at 6; dkt. entry no. 20, Pl Stmt. of Undisputed Facts ("Pl. Stmt. Facts") at ¶ 9.) The plaintiff was required to report to work wearing a uniform issued from a NJSP warehouse, which included a navy blue polo shirt, black pants, and black shoes. (Pl. Br. at 4; see also dkt. entry no. 18, Def. Stmt. of Undisputed Facts ("Def. Stmt. Facts") at ¶¶ 8-10; Pl. Stmt. Facts at ¶ 4; dkt. entry no. 18, Patel Cert., Ex. B, Standard Operating Procedure ("SOP") F38 at III.)

   The plaintiff learned that she was pregnant on April 30, 2007, and informed human resources of her pregnancy in June. (Pl. Stmt. Facts at ¶¶ 11, 13.) The plaintiff states that in early May 2007, she informed her supervisor that she needed a larger uniform shirt to accommodate her larger size due to her pregnancy, but the supervisor "refused to provide any appropriate clothing." (Id. at ¶ 14.) In early June 2007 the plaintiff began wearing maternity clothes she had purchased herself, including black maternity pants, gray shoes, and gray or black maternity shirts, in addition to a black zip-up sweatshirt she purchased from the NJSP. (Id. at ¶ 15.)

   During the relevant time period, the supervisory hierarchy consisted of Unit Head Sgt. Griffin, Assistant Unit Head Sgt. Rochinski, Floor Supervisor Sgt. Dziedzic, and Supervising Senior PST Ignazio Amari. (Id. at ¶ 6.) The plaintiff contends in late

June 2007, Sgt. Griffin "confronted" the plaintiff about her maternity shirts and "alluded to the increase in the size of [the plaintiff's] bust and abdomen." (Id. at ¶ 16.) The plaintiff explained that she had asked her supervisor for maternity clothing, but none had been provided. (Id.)

Sgt. Dziedzic approached the plaintiff in mid-July 2007 and said that Sgt. Griffin wanted him to address "the shirt issue." (Id. at ¶ 17.) The plaintiff responded by stating that she had twice asked for maternity clothing and been denied, and stated that she was being harassed because of her pregnancy. (Id.)

A contract between the plaintiff's union and the NJSP addressed, inter alia, "Pregnancy-Disability Leave and Child Care Leave." (Patel Cert., Ex. C, Local No. 195 Int'l Fed. of Prof. and Technical Engineers Agreement with State of New Jersey ("IFPTE Agreement").) The IFPTE Agreement states in pertinent part:

> Any female under this contract who, as a direct result of pregnancy, is unable to wear the uniform supplied by the state, will be supplied with a maternity uniform. If a maternity uniform is not supplied, the employee will be permitted to wear appropriate uniform like personal clothing approved by the State or a larger size uniform.

(Id. at Article 30, Section A.5.) Standard Operating Procedure F38, "Uniforms for Civilian Public Safety Telecommunicators," states that "Enlisted State Police personnel who supervise public safety telecommunicators shall be responsible for their adherence

3

to this order and uniformity of attire at their respective area of responsibility." (Patel Cert., Ex. B, SOP F38.)

Defendant contends, and the plaintiff does not dispute, that the plaintiff (1) was aware that she could have, and in the past had, gone to the warehouse to try on uniforms and obtain a larger size; (2) read the IFPTE Agreement regarding her uniform after she became pregnant; and (3) neither exchanged her state-issued work uniform nor sought the State's approval of the maternity clothes she had purchased. (Def. Stmt. Facts at ¶ 10; dkt. entry no. 20, Pl. Response to Def. Stmt. Facts ("Pl. Resp.") at ¶ 10; Def. Stmt. Facts at ¶ 16; Pl. Resp. at ¶ 16; Def. Stmt. Facts at ¶ 17, Pl. Resp. at ¶ 17.) Instead, it appears that the plaintiff believed the NJSP was required to provide a maternity uniform, and that because she believed her non-issued maternity clothing to be similar to the uniform clothing approved by the state, it "therefore met the requirements of the" IFPTE Agreement. (Pl. Stmt. Facts at ¶ 15; see also Pl. Br. at 4.) The plaintiff also apparently does not dispute the record evidence before the Court indicating that the non-state-issued maternity clothing worn by the plaintiff included a spandex top having the appearance of gym or workout wear that exposed her bare midriff area and lower back. (Def. Stmt. Facts at ¶ 20; Pl. Resp. at ¶ 20; Patel Cert., Ex. T, Ciocian Dep. at 79:17-22; see also Patel Cert., Ex J, Interview Summ. of Roger Rochinski at 5 ("In speaking with

4

Ciocian, Rochinski noticed that Ciocian was wearing a tight, grey spandex style shirt, similar to those worn at the gym."); Patel Cert., Ex. K, Interview Summ. of Derrick Griffin at 5 (stating that when the plaintiff's pregnancy "began to show," he noticed that the plaintiff "began to wear a tight, blue or black shirt while working" that he felt was inappropriate "because it rode up in the front and exposed her bare midriff area").)[1]

The plaintiff contends that she was subject to an adverse action for "the shirt issue" when, on July 17, 2007, the plaintiff received notice that her shift would be switched from the 6:00 AM – 6:00 PM shift to the 10:00 AM – 10:00 PM shift ("10:00 AM shift") for July 24, 2007, due to a staffing shortage. (Pl. Stmt. Facts at ¶ 19; Def. Stmt. Facts at ¶ 36; Patel Cert., Ex. L, Interview Summ. of Ignazio Amari at 6; Ciocian Dep. at 125:23-126:6.)[2]  The parties agree that during the summer months,

---

[1] The Court considers the interview summaries on the basis that they were produced in discovery, would be admissible in evidence as business records, and have been certified by each of the interview subjects as accurately reflecting facts within their personal knowledge about which they would be competent to testify about at trial.  Fed.R.Evid. 803(6); Fed.R.Civ.P. 56(c)(2).  (See dkt. entry no. 21, Patel Cert. & Ex. I, Griffin Cert.; Ex. J, Rochinski Cert.; Ex. K, Dziedzic Cert.; Ex. L, Amari Cert.)

[2] The notice to the plaintiff of the shift change apparently occurred after her conversation with Sgt. Griffin but before her conversation with Sgt. Dziedzic.  Sgt. Griffin's contemporaneous notes indicate that Sgt. Dziedzic spoke to the plaintiff regarding her uniform on July 23, 2007.  (Dkt. entry no. 22, Def. Response to Pl. Stmt. Facts ("Def. Resp.") at ¶ 16; Patel Cert., Ex. I, Interview Summ. of Sgt. Griffin, Attach. 1, Notes.)

an additional PST position is added to each squad, and that as a result, the 10:00 AM shift is added and assigned to all PSTs on a rotating schedule.  (Def. Stmt. of Facts at ¶ 33; Pl. Resp. at ¶ 33; Ciocian Dep. at 95:3-23.)  The plaintiff claims that the rotational 10:00 AM shift was assigned to her on short notice, interfering with her child care plans.

> According to the IFPTE Agreement,
>
> [a]n employee whose shift is changed shall be given adequate notice which normally will be at least two (2) weeks and which shall not be less than one (1) week, except in the case of an emergency.  Should such advance notice not be given, an employee affected shall not be deprived of the opportunity to work the regularly scheduled work week.

(IFPTE Agreement at Article 10, Section C.)  While the plaintiff claims she was entitled to two weeks' notice for the shift change, the defendant argues that she was entitled to only one week's notice, that she did not work on the seventh day before the change in shift and so was not around to be advised of the change, and, in any event, ultimately did not work the 10:00 AM shift on July 24, 2007, because she was able to switch shifts with another PST.  (Pl. Stmt. Facts at ¶ 18; Def. Resp. at ¶ 19; Def. Stmt. Facts at ¶ 35.)  The plaintiff's deposition testimony is consistent with the defendant's presentation of this situation.  (Ciocian Dep. at 127:1-25 (stating that one week's notice was required for one-day shift change, and that she did not work on the seventh day before the change).)  The plaintiff

questioned two supervisors about the reason for the shift change and received no satisfactory answer. (Pl. Stmt. Facts at ¶¶ 20-21; Ciocian Dep. at 103:10-25.)

The plaintiff further asserts that when she received her schedule for September 2007 in late August, she discovered that she had been assigned two 10:00 AM shifts. (Pl. Stmt. Facts at ¶ 22.) The plaintiff believed these shift changes "were punitive" and sought to discuss it with Mr. Amari, the supervising PST in charge of scheduling, who told her that she did not understand the rotation process. (Id. at ¶¶ 22-23.) On September 7, 2007, the plaintiff sought to speak with Sgt. Griffin about the shift changes, but he claimed to be unavailable. (Id. at ¶ 23.) She asserts that she then spoke about the scheduling issue to Sgt. Rochinski, who told her to "stop her bitching," and that if she "kep[t] bitching," he would "make it worse." (Id. at ¶ 24.) The record indicates that the plaintiff ultimately worked two 10:00 AM shifts during the summer of 2007. (Patel Cert., Ex. M, 2007 ODU Central 10A Shift Rotation.) The plaintiff's squad consisted of eleven PSTs, of whom eight worked the 10:00 AM shift twice; two worked the 10:00 AM shift once; and one PST worked the 10:00 AM shift three times. (Id.)

The plaintiff states that after the scheduling issues occurred, she lodged a complaint of discrimination with the New Jersey State Office of the Attorney General and also contacted

7

the New Jersey Department of Labor Relations. (Pl. Stmt. Facts at ¶ 25.)[3] Shortly thereafter, on or about September 11, 2007, Sgt. Rochinski instructed the plaintiff to bring in her state-issued uniform shirts to be exchanged for a larger uniform shirt; according to the plaintiff, he also ordered to wear her sweatshirt zipped up, "apparently to cover her pregnancy." (Id. at ¶ 26; Def. Resp. at ¶¶ 26-27.) She states that on September 13, 2007, she was asked to speak with Sgt. Griffin, who told her that her maternity shirts were "offensive" and drew "undue attention" to her. (Pl. Stmt. Facts at ¶ 27.) She alleges that this conversation left her feeling "so embarrassed and humiliated about her pregnancy that she shook physically." (Id.)

Sgt. Griffin then instructed the plaintiff to return her state-issued uniform shirts and informed her that he would obtain larger shirts for her. (Id. at ¶¶ 27-28.) Sgt. Griffin gave the plaintiff two extra-large uniform shirts to replace her old shirts. (Id.; Def. Resp. at ¶ 29.) The plaintiff, who is 5'7" and wears a women's size small (presumably when not pregnant),

---

[3] Defendant denies that the plaintiff took such actions and notes that the plaintiff did not produce any corroborating documentation during discovery. (Def. Resp. at ¶ 25.) The Complaint included as an exhibit a right-to-sue letter from the U.S. Equal Employment Opportunity Commission ("EEOC") dated September 30, 2008, referencing EEOC No. 524-2008-99, but the record otherwise contains no documentation of complaints lodged with either the New Jersey Office of the Attorney General or the New Jersey Department of Labor Relations. (Compl., Ex. A; Patel Cert., Ex. P, EEOC Charge of Discrimination No. 524-2008-99, filed 12-27-07.)

tried on the extra-large shirts, and relates the incident and its fallout as follows:

> The shirts provided by Sgt. Griffin went to my knees, while the sleeves went to my elbows. Because of my pregnancy, the shirt was tight on my stomach, causing the shirt to pull against my neck when I sat. I cried when I saw myself in the shirts, and vomited. I felt completely ashamed.
>
> Sgt. Griffin left the building after forcing me to change clothes, but not before telling [the union representative] that he intended to discipline me for insubordination if I failed to wear the shirts he had selected.
>
> I started having migraines from the anxiety, and stress-related pelvic pressure. I went to my doctor. Because of the danger to my pregnancy, on September 20, 2007, my doctor ordered that I not return to work. I was forced to take disability leave.

(Pl. Br., Ex. 2, Pl. Decl. at ¶¶ 29-32.)[4] The day the plaintiff tried on the extra-large polo shirt was the last day she worked at NJSP. (Ciocian Dep. at 83:17-19.) The plaintiff submitted a formal letter of resignation on February 4, 2008. (Patel Cert., Ex. S, 2-4-08 Resignation Letter from Ciocian to Amari.)

The plaintiff alleges that she was "constructively discharged" because of the discrimination and harassment against her. (Pl. Stmt. Facts at ¶ 32.)

---

[4] The record indicates that the plaintiff was issued size large uniform shirts in 2004, size small uniform shirts in 2005, and a size medium sweater in 2005, before being issued the size extra-large uniform shirts in September 2007. (Patel Cert., Ex. F, Personnel Uniform and Equipment Records.)

**DISCUSSION**

I.  **Summary Judgment Standard**

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56(c) provides that summary judgment is proper if the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor."  United States ex rel. Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

II. **Analysis**

   A.  **Title VII**

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against, any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  The Pregnancy Discrimination Act amended Title VII to clarify that "because of sex" includes pregnancy, childbirth, or related medical conditions.  Id. § 2000e(k).

Title VII's prohibition against sex discrimination "is breached whenever an employee's pregnancy is a motivating factor for the employer's adverse employment decision." Noecker v. Reading Hosp., No. 08-3553, 2010 WL 363840, at *4 (E.D. Pa. Jan. 27, 2010). "A claim under the Pregnancy Discrimination Act is analyzed under the usual Title VII discrimination claim framework." King v. City of New Kensington, No. 06-1015, 2008 WL 4492503, at *9 (W.D. Pa. Sept. 30, 2008). Thus, although Count I and Count II allege separate violations of Title VII for sex discrimination and pregnancy discrimination, respectively, the Court considers the Title VII Counts as a single claim because the plaintiff has not suggested that she was discriminated against solely based on her gender, as opposed to her pregnancy. (Compl. at 15-16.)

### 1. Discrimination, Harassment, and Hostile Work Environment

To succeed on a claim based on a hostile work environment, a plaintiff must prove that:

> (1) the employee suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) respondeat superior liability exists.

Small v. KS Eng'rs PC, No. 08-3458, 2010 WL 1705002, at *2 (D.N.J. Apr. 26, 2010) (citation omitted). The harassment must

11

be "so severe or pervasive as to alter the conditions of the victim's employment and creates an abusive working environment." Id. (citation omitted).

Mere speculation is not sufficient to demonstrate intentional discrimination. Johnson v. St. Luke's Hosp., 307 Fed.Appx. 670, 672 (3d Cir. 2009). To the extent the plaintiff asserts that she suffered intentional discrimination, it is limited to vague assertions that she "felt like all eyes were on [her] all the time" and Sgt. Griffin and possibly Sgt. Rochinski directed "gestures [and] . . . looks" at her that she interpreted as disgust at her pregnant appearance. (Ciocian Dep. at 89:2-92:24.) She was unable to articulate an instance of harassment other than the time Sgt. Rochinski told her to "stop [her] bitching or he can make [her] work life harder." (Ciocian Dep. at 89:14-17 ("To me, that's harassing me because I'm asking a question and you're telling me, stop your bitching.").) Sgt. Rochinski may have also asked the plaintiff if she was having twins. (Def. Stmt. Facts at ¶ 27.)

Insofar as the plaintiff perceived Sgt. Griffin and Sgt. Rochinski as looking her up and down, engaging her about "the shirt issue," or instructing her to wear the zip-up sweatshirt over her maternity shirt, the record suggests, and the plaintiff does not dispute, that these interactions were prompted by the plaintiff's sartorial choices resulting in the exposure of skin

12

on her midriff and/or lower back.  Moreover, we find that Sgt. Rochinski's "stop bitching" and "are you having twins" comments are neither severe enough nor, as apparently isolated incidents, pervasive enough to constitute intentional discrimination or harassment or to create a hostile work environment.  See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1297 (3d Cir. 1997) ("[N]ot every insult, slight, or unpleasantness gives rise to a valid Title VII claim."); see also Carrattini v. Woods Servs., Inc., No. 08-5201, 2010 WL 447453, at *3 (E.D. Pa. Feb. 4, 2010) ("Isolated or sporadic incidents, unless extremely serious, and offhand comments are not sufficient to sustain a claim."). Comments "alluding to" the plaintiff's changing physical appearance or referring to "the shirt issue" simply do not amount to a workplace "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment."  Carrattini, 2010 WL 447453, at *4 (internal citation omitted).

The plaintiff has not shown that the undisputed facts "rise to the level of creating an objectively hostile or abusive work environment."  Small, 2010 WL 1705002, at *3 (emphasis added). In particular, the allegation that she was ashamed and humiliated by being forced to wear an extra-large polo shirt suggests unreasonableness on the part of the plaintiff.  Even presuming that the plaintiff was approached by supervisors on several

13

occasions between June 2007 and September 2007 about exchanging her state-issued uniform shirts for a larger size so that she would stop wearing the non-state-issued maternity clothing — an issue originally raised by the plaintiff herself early in her pregnancy — she has not shown that a reasonable factfinder would "conclude that [she] was the subject of intentional harassment that would be objectively considered severe, pervasive, or a detriment to workplace performance." Id. Judgment will therefore be entered in favor of the defendant as to the plaintiff's claims of harassment, discrimination, and hostile work environment.

By the same reasoning, the plaintiff cannot prevail on her claim that she was constructively discharged by reason of harassment and a hostile work environment. See Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 n.4 (3d Cir. 2006) ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment."). A plaintiff advancing a hostile work environment constructive discharge claim "must show working conditions so intolerable that a reasonable person would have felt compelled to resign." Pa. State Police v. Suders, 542 U.S. 129, 147 (2004). The plaintiff's allegations that she responded to being asked to wear an extra-large uniform shirt by crying, vomiting, and refusing to return to work, are

14

"wholly inadequate to show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." Grassmyer v. Shred-It USA, Inc., No. 09-3876, 2010 WL 3330102, at *9 (3d Cir. Aug. 25, 2010) (internal quotation and citation omitted). Accordingly, "[b]ecause [the plaintiff's] work conditions did not create a hostile work environment, she cannot maintain a constructive discharge claim." Noecker, 2010 WL 363840, at *7 n.9.

### 2. Retaliation

The anti-retaliation section of Title VII provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment or practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3a. The plaintiff, to assert a prima facie case of retaliation under Title VII, must allege that "(1) [s]he engaged in protected activity; (2) the employer was aware of that activity; (3) the employer took some adverse action against him; and (4) the circumstances were sufficient to permit the inference that the protected activity was a contributing factor for the adverse action." Hasan v. U.S. Dep't of Labor, 545 F.3d 248, 251 (3d Cir. 2008).

An "adverse employment action," as described in the third prima facie element, "alters the employee's compensation, terms,

conditions, or privileges of employment." Cortes v. Univ. of Med. & Dentistry, 391 F.Supp.2d 298, 312 (D.N.J. 2005) (citations omitted). "[T]he conduct must be serious and tangible enough to materially alter an employee's terms and conditions of employment or adversely affect her status as an employee." Id. "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). In most cases, a tangible employment action "inflicts direct economic harm." Id. at 762.

Assuming, arguendo, that the plaintiff engaged in protected activity by lodging a complaint of discrimination with the New Jersey Office of the Attorney General and contacting the New Jersey Department of Labor Relations, see supra at 8 n.3, we find that the plaintiff has not established a prima facie claim of retaliation because she cannot show an adverse employment action.

The plaintiff has cited two putative instances of retaliation: being assigned to work the rotational 10:00 AM shift on July 24, 2007 on six days' notice and for two days during the month of August, and being forced to wear an extra-large uniform shirt. As to the rotational 10:00 AM shift and changes to the plaintiff's schedule, the NJSP has proffered

16

legitimate nondiscriminatory reasons for why it assigned the July 24, 2007 shift on six days' notice instead of seven, and the record shows that the plaintiff, in being assigned two 10:00 AM shifts for the month of September, was in equal stead with her coworkers.[5] Moreover, because NJSP policy allowed the plaintiff to switch shifts with a coworker in order to accommodate her child-care issues, the plaintiff actually worked her normal 6:00 AM shift on July 24, 2007, and thus no "significant change" in the conditions of her employment occurred. Ellerth, 524 U.S. at 761. We therefore conclude that the scheduling issues, as presented by the plaintiff, do not constitute an actionable claim for unlawful retaliation.

Being asked to wear an extra-large uniform shirt similarly does not amount to an "adverse employment action" in this instance. The NJSP's issuing the plaintiff a uniform that was oversized in length but tight around the stomach area, in the late months of the plaintiff's pregnancy, after previously admonishing the plaintiff about the apparent impropriety of her non-state-issued maternity clothing, simply does not rise to a level "serious and tangible enough to materially alter . . .

---

[5] Although both parties appear to agree that the plaintiff was given six days' notice as to the schedule change of July 24, 2007, the plaintiff has stated elsewhere that she was advised of the schedule change on July 17, 2007--by this Court's calculation, seven days prior to July 24, 2007. (Pl. Stmt. Facts at ¶ 19.)

17

[the] terms and conditions" of the plaintiff's employment. Cortes, 391 F.Supp.2d at 312. To constitute a materially adverse action sufficient for a retaliation claim, "[t]he action must . . . have amounted to more than mere 'petty slights, minor annoyances, and simple lack of good manners.'" Rivers v. Potter, No. 05-4868, 2007 WL 4440880, at *3 (D.N.J. Dec. 18, 2007). The issuance of the extra-large uniform shirt, along with the warning to the plaintiff that she would be disciplined if she failed to wear it, should have been taken as a minor annoyance rather than as a constructive discharge or other adverse employment action. Moreover, there is no reason the plaintiff could not have worn the shirt as instructed, either altered or as issued. Nor does the record indicate that the plaintiff sought state approval for "appropriate uniform like personal clothing" as an alternative. (IFPTE Agreement, Art. 30, Section A.5.)

    We therefore conclude that judgment should be entered in favor of the defendant on the plaintiff's retaliation claims.

**B.     NJLAD**[6]

The standards of proof applicable to claims of hostile work environment or retaliation are generally the same under the NJLAD as under the federal anti-discrimination statutes. Abrams v. Lightolier Inc., 50 F.3d 1204, 1212 (3d Cir. 1995); Feeney v. Jefferies & Co., Inc., No. 09-2708, 2010 WL 2629065, at *4 (D.N.J. June 28, 2010) (noting that legal standards governing claims under Title VII and the NJLAD are the same and referring to federal case law in its analysis of the plaintiff's NJLAD claims); see also Roa v. Roa, 985 A.2d 1225, 1235-36 (N.J. 2010) (relying on federal Title VII case law in discerning scope of actionable retaliatory conduct in NJLAD context).

As discussed above, the plaintiff failed to establish a prima facie claim for hostile work environment or retaliation. Her claims under the NJLAD fail for the same reasons her claims under Title VII and the Pregnancy Discrimination Act fail--she is unable to show that she suffered intentional discrimination that was either severe or pervasive; her work environment was not objectively hostile; and no adverse employment action occurred.

---

[6] The plaintiff asserts jurisdiction under 28 U.S.C. § ("Section") 1331, based on the Title VII claim. (See Compl. at 2.) Having disposed of the Title VII claim, the Court need not address the NJLAD claim, and could dismiss the NJLAD claim without prejudice to reinstate in state court. See 28 U.S.C. § 1367(c)(3), (d). However, there appears to be jurisdiction under Section 1332 as well, as the plaintiff is a citizen of Florida. (See Compl. at 1.)

To the extent the plaintiff seeks punitive damages in connection with her state law claim, she clearly has not met the "heightened standard" of liability required for punitive damages, as established in Lehmann v. Toys 'R Us, Inc., 626 A.2d 445, 465 (1993).  (Compl. at 19.)  See Cortes, 391 F.Supp.2d at 316.  Judgment will be entered in favor of the defendant as to the plaintiff's NJLAD claim.

## CONCLUSION

The Court, for the reasons stated supra, will grant the defendant's motion.  The Court will issue an appropriate order and judgment.

                                                s/Mary L. Cooper            
                                                **MARY L. COOPER**
                                                United States District Judge

Dated:    October 15, 2010